In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00078-CV
______________________________


 
 
IN THE INTEREST OF A.K., A CHILD
 
 


                                              

On Appeal from the 71st Judicial District Court
Harrison County, Texas
Trial Court No. 03-0743


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Chief Justice Morriss


MEMORANDUM OPINION

            In contrast to the genuine love Cartha Kipp and her daughter, A.K., have for each other,
Kipp's legacy to A.K. was a "roller coaster" of a life with instability in housing, relationships,
supervision, schooling, and Kipp's employment, as well as an environment of illegal drug use and
even some domestic violence. Kipp's parental rights to A.K.


 were terminated by the trial court on
the  State's  petition.  We  affirm  the  termination  of  Kipp's  parental  rights  to  A.K.  because  we
hold (1) that factually  sufficient  evidence  supports  the  finding  that  termination  is  in  A.K.'s
 best  interest and (2) that the trial court's broad-form jury submission was proper.
1.         Factually Sufficient Evidence Supports the Finding That Termination Was in A.K.'s Best             Interest
            Kipp's evidentiary sufficiency point asserts only that the evidence was factually insufficient
as to the best interest finding, just one of those findings required for termination. There was ample
evidence to support that finding.
            Any complaint that the evidence is factually insufficient to support parental rights termination
is analyzed by a heightened standard of appellate review. In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). 
That standard is whether the evidence is such that a fact-finder could reasonably form a firm belief
or conviction that the allegations in the petition seeking revocation are true. Id. at 22. If, in light of
the entire record, the disputed evidence that a reasonable trier of fact could not have credited in favor
of the finding is so significant that a trier of fact could not reasonably have formed a firm belief or
conviction that the allegations supporting termination are true, then the evidence is factually
insufficient. Id.
            Among the necessary findings to support termination, the trier of fact must find that
termination is in the best interest of the child. See Tex. Fam. Code Ann. § 161.001(2) (Vernon
2002). There is a strong presumption that the best interest of the child is served by keeping custody
with the natural parent. See In re D.M., 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). 
The parents' rights, however, are not absolute; protection of the child is paramount. In re A.V., 113
S.W.3d 355, 361 (Tex. 2003).
            A nonexclusive list of factors established by the Texas Supreme Court helps measure the best
interest of the child: (a) the desires of the child, (b) the emotional and physical needs of the child
now and in the future, (c) the emotional and physical danger to the child now and in the future,
(d) the parental abilities of the individuals seeking custody, (e) the programs available to assist these
individuals to promote the best interest of the child, (f) the plans for the child by these individuals
or by the agency seeking custody, (g) the stability of the home or proposed placement, (h) the acts
or omissions of the parent which may indicate that the existing parent-child relationship is not a
proper one, and (i) any excuse for the acts or omissions of the parent. See Holley v. Adams, 544
S.W.2d 367, 371–72 (Tex. 1976). Best interest, however, neither requires proof of any unique set
of factors, nor does it limit proof to any specific factor. See In re H.R., 87 S.W.3d 691, 700 (Tex.
App.—San Antonio 2002, no pet.). Much of the evidence touches on a number of these factors.
            We note that the only witnesses expressing an opinion on the ultimate question of A.K.'s best
interest— psychologist Dr. Donald Winsted, Court Appointed Special Advocates (CASA) volunteer
David Darden, and state Child Protective Services (CPS) caseworker Dierdre Phillips—all said
A.K.'s best interest would be best served by terminating Kipp's parental rights.
            Phillips and Winsted both testified A.K. loves her mother dearly. Both acknowledged A.K.'s
desire to remain with her mother. Further, Winsted testified that it will be a difficult experience for
A.K. to work through if Kipp's parental rights were to be terminated. A.K.'s love for and desire to
be with her mother oppose termination.
            Kipp knowingly placed A.K. in conditions or surroundings that exposed her to drugs and
physical and mental abuse, each of which is dangerous to A.K.'s physical and emotional well-being. 
While Kipp established herself in Texas in the summer of 2000, she left A.K. in the custody of
Ronald Rochelle, a man who had physically assaulted Kipp. In the fall of 2002, Kipp brought A.K.
with her to live with Michael Shane Clark in an apartment on Forbes Pitt Road. Clark had
previously struck Kipp. After A.K. moved in with Clark and Kipp, she was witness to their volatile
relationship, which would often turn heated. Kipp and Clark both smoked marihuana and crack
cocaine while A.K. resided with them. Even though Clark and Kipp did not smoke in front of A.K.,
they would be under the influence of the illegal drugs while supervising her. Clark testified that,
every week or whenever he was paid, he would purchase drugs and would periodically purchase
drugs until the money was gone. Clark would spend most of his money on drugs, so Clark, Kipp,
and A.K. would sometimes have less food than they should. The diversion of money to drugs
contributed to their eviction from the Forbes Pitt Road apartment. 
            Kipp's unsteady job history, frequent moves, and drug habits actively interfered with A.K.'s
schooling and childhood. After the eviction, Clark, Kipp, and A.K. moved into a motel, the Globe
Inn in Longview, where they lived in one bedroom with one bed. Clark and Kipp continued to use
crack cocaine while at the Globe Inn. After two and a half weeks, Kipp and A.K. moved to an
apartment on Clover Lane in Longview rented by James and Wendy Johnson, whom Kipp had met
while living at the Globe Inn. While residing with the Johnsons, Kipp relied on them to monitor
A.K. while she worked the night shift at a Waffle House. Kipp and A.K. resided at Clover Lane for
four days before they moved in with Kipp's boss, Rebecca Bryant, on Centenary Lane in Longview. 
            After a couple of weeks, Kipp moved out of Bryant's apartment because Kipp, at the time,
was considering leaving her job at the Waffle House to become a waitress at a "strip joint" known
as Theresa's. At that time, Kipp moved A.K. in with her sister, Jolene Oney. Kipp went to jail. 
After a short time in jail, Kipp moved with A.K. into the house of Kipp's newest employer, Bruce
Nelson, for whom Kipp sold flowers in nightclubs in Kilgore, Tyler, and Longview. By the end of
June, Kipp and A.K. had moved yet again, this time to Harleton to live with two men, Mark and Paul
Bryer, one of whom was a distant relation of Kipp. 
            From March 31, 2003 to July 18, 2003, as stated above, Kipp had A.K. residing in seven
different places. A.K. missed a significant amount of school due to oversleeping, packing, and
moving. At times, Kipp left A.K. in the custody of virtual strangers. During some of this time, A.K.
was placed with Kipp's sister because Kipp was incarcerated from May 20, 2003 to June 13, 2003,
for theft by check. Kipp has also been arrested for terroristic threat, drug possession, possession of
marihuana, and traffic violations. 
            Kipp first signed up for a child safety evaluation and plan with CPS on April 10, 2003. The
safety plan ordered Kipp to notify CPS of any new address, room number, and telephone numbers;
to enroll A.K. in school by April 14, 2003; to provide proof of A.K.'s regular attendance in school;
to keep a doctor's record for any absences; not to allow anyone to use drugs around A.K.; and not
to allow A.K. to ride in a vehicle with anyone who had been consuming alcohol. 
            In spite of agreeing to the safety plan, Kipp continued for a time to reside with Clark at the
Forbes Pitt Road apartment and the Globe Inn. Clark and Kipp continued to abuse drugs while
supervising A.K. Kipp tested positive for marihuana in four out of five drug tests. On several
occasions, spanning August 2003 through April 2004, Kipp refused to take drug tests requested by
CPS. On July 28, 2003, during a home visit, Phillips, the caseworker from CPS, observed a bag of
marihuana lying on a television tray table. Kipp never submitted to drug treatment. 
            The trial court granted temporary custody of A.K. to CPS and, among other conditions stated
above, ordered Kipp to attend and cooperate fully in counseling sessions as directed by CPS in order
to address the specific issues that led to A.K.'s removal. Kipp failed to complete her ordered
counseling sessions with Winsted. Kipp provided excuses that her car had broken down, that the
appointment conflicted with her work schedule, that Winsted never notified her of future
appointments, and that she had had bronchitis for four weeks. 
            Further, Kipp failed to secure steady employment within the six-month period. Kipp blames
others for her circumstances. 
            Kipp was summoned to appear in front of Judge Hugh Taylor to address the issue of A.K.'s
truancy. Kipp said A.K. was absent from school because they were moving, it took two weeks to
address A.K.'s lice problem, and they overslept a couple of times. Other evidence, however, suggests
A.K. also missed school at times because of Kipp's laziness, negligence, or drug use. Kipp has
allowed A.K. to be supervised by virtual strangers, the Johnsons, and an individual under the
influence of drugs, Clark. Kipp herself has been under the influence of illegal drugs while
supervising A.K.
            Kipp has also failed to attend the counseling sessions or drug treatment programs. Winsted
testified Kipp is having difficulty linking her actions to the consequences of those actions. Thus,
A.K. and Kipp have often reversed their roles, and A.K. has taken too much responsibility. Role
reversal hinders the emotional growth of a child in the future.
            This evidence strongly favors termination.
            A.K. is currently residing with Oney. Oney, however, has refused to adopt A.K. If A.K.
continues to reside with Kipp, she is at risk of direct exposure to illegal drugs and violent
relationships. Further, Kipp has been unable to provide a stable residence, as evidenced by living
in seven different places within a three-month period. This evidence favors termination.
            Kipp has successfully completed a homemaker course and has received a certificate. Kipp,
however, neither successfully completed the required counseling sessions, nor did she seek treatment
for her drug problem. Winsted testified that, from the beginning to the end of Kipp's counseling
sessions, she harbored a victim mentality, feeling she is the victim of circumstances instead of taking
responsibility for her choices. He further testified that, unless Kipp's mentality changed, it would
damage her ability to address the emotional and physical needs of A.K. now and in the future. This
evidence favors termination.
            While there are programs available, Kipp has not taken advantage of them as she should
have. Kipp's domestic life has been chaotic. From Kipp's patterns of behavior shown by the above-referenced evidence, it would likely remain so. This evidence favors termination.
            CPS indicates it intends to place A.K. with their adoption unit. A.K. will be assessed and
the information will be gathered in order to match her with an appropriate family. The family that
will adopt A.K. will go through a thorough background check, home studies, and hours of training. 
Once the pool of families is narrowed, A.K. will be placed with a family for six months before her
adoption is finalized. During the entire adoption process, A.K. will be eligible to use CPS resources. 
Hence, A.K. will continue to receive medications and will receive counseling to address separation
issues, guilt issues, and other issues as required. Compared to the alternative, this evidence favors
termination.
            Based on Kipp's actions, inactions, history of drug abuse, and failure to take responsibility
and remedy past problems, we conclude the evidence was factually sufficient to support the finding
that termination was in the best interest of A.K. We overrule Kipp's factual insufficiency contention.
2.         The Jury Charge Is Proper
            We also hold the trial court's broad-form jury submission was proper, because the controlling
question is the termination of the parental rights, not what specific grounds support termination. The
State's petition for termination alleged three statutory grounds on which the State based its petition. 
The jury charge did not require the jury to make specific findings as to each statutory ground, reading
in pertinent part as follows:
For the parent-child relationship in this case to be terminated with respect to
CARTHA KIPP, the mother of the child [A.K.], it must be proven by clear and
convincing evidence that at least one of the following events has occurred:
 
1. CARTHA KIPP has engaged in conduct or knowingly placed the child with
persons who engaged in conduct which endangered the physical or emotional well-being of the child; OR
 
2. CARTHA KIPP has knowingly placed or knowingly allowed the child to
remain in conditions or surroundings which endanger the physical or emotional well-being of the child; OR
 
3. CARTHA KIPP failed to comply with the provisions of a court order that
specifically established the actions necessary for CARTHA KIPP to obtain the return
of the child who has been in the permanent or temporary managing conservatorship
of the Department of Family and Protective Services for not less than nine months
as a result of the child's removal from the parent under Chapter 262 for the abuse or
neglect of the child.

                        . . . .
 
Question No. 1: Termination of the Parental Rights of Cartha Kipp
Should the parent-child relationship between Cartha Kipp and the child,
[A.K.], be terminated?
 
Answer "Yes" or "No" as to each child: . . . . 

            Kipp contends the trial court erred in denying her request that the jury be asked to decide
separately which of the three alleged statutory grounds had occurred. She contends this method
should be used instead of the disjunctive charge and broad questions format.
            We review an asserted jury charge error under an abuse of discretion standard. See Tex. Dep't
of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990). A trial court abuses its discretion in
submitting a question to the jury if it acts arbitrarily, unreasonably, and without reference to any
guiding rules or principles. See Goode v. Shoukfeh, 943 S.W.2d 441, 446 (Tex. 1997).
            In jury cases, the court shall, whenever feasible, submit broad-form jury questions. Tex. R.
Civ. P. 277; see In re B.L.D.,113 S.W.3d 340, 348 (Tex. 2003). Rule 277 applies in proceedings to
terminate parental rights. E.B., 802 S.W.2d at 649. In upholding submission of questions to the jury
in broad form very similar to those submitted in the instant case, the Texas Supreme Court explained
how E.B.'s argument focused on the wrong question:
The controlling question in this case was whether the parent-child relationship
between the mother and each of her two children should be terminated, not what
specific ground or grounds under § 15.02


 the jury relied on to answer affirmatively
the questions posed. All ten jurors agree that the mother had endangered the child
by doing one or the other of the things listed in § 15.02.

Id. The Texas Supreme Court has impliedly reaffirmed its holding in E.B. See B.L.D., 113 S.W.3d
at 354–55 (concluding the charge "follows our precedent in E.B., tracks the statutory language of the
Family Code, and comports with Texas Rules of Civil Procedure 277 and 292").
            Despite E.B., several other biological parents have advanced Kipp's argument—but in each
case, unsuccessfully. See In re L.C., 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.);
In  re  J.M.M.,  80  S.W.3d  232,  249  (Tex.  App.—Fort  Worth  2002,  pet.  denied)  ("We  cannot
agree . . . that broad-form jury charge submissions are per se violative of due process in termination
cases."); In re K.S., 76 S.W.3d 36, 49 (Tex. App.—Amarillo 2002, no pet.) ("We are bound to follow
E.B. unless the Texas Supreme Court overrules or vitiates it."); In re M.C.M., 57 S.W.3d 27, 31 n.2
(Tex. App.—Houston [1st Dist.] 2001, pet. denied) ("E.B. has not been overruled, and this Court
must follow it."). We continue to be bound by E.B.; thus, the submission of a disjunctive question
regarding a parent's predicate act or omission under Section 161.001(1) is proper. Here, we have
such a submission and conclude the trial court did not abuse its discretion in overruling Kipp's
objection to the jury charge.
 
Conclusion
            Having found factually sufficient evidence in the record to demonstrate that termination was
in A.K.'s best interest and having found no error in the jury charge, we overrule Kipp's points of
error. Accordingly, we affirm the trial court's termination of Kipp's parental rights to A.K.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          September 29, 2004
Date Decided:             January 5, 2005